### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

**LLOYD EDWARD FLANAGAN,**

**Plaintiff,**

-vs-                                                        Case No.  **6:07-cv-301-Orl-DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

**Defendant.**

_____

### MEMORANDUM OPINION & ORDER

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title

42 United States Code Section 405(g), to obtain judicial review of a final decision of the

Commissioner of the Social Security Administration (the Commissioner) denying his claim for

Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the

Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings

and memoranda submitted by the parties in this case.  Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **REVERSED** and

**REMANDED**.

### I. BACKGROUND

**A.      Procedural History**

Plaintiff filed for a period of disability, DIB and SSI benefits on January 6, 2003, alleging an

onset of disability on January 6, 2003, due to a car accident on August 8, 2002.  R. 1242-44, 463-66.

His application was denied initially and upon reconsideration.  R. 26, 28-31, 467-71.  Plaintiff requested a hearing, which was held on April 19, 2006, before Administrative Law Judge Melvin Benitz (hereinafter referred to as "ALJ").  R. 477-518.  In a decision dated May 8, 2006, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision.  R. 10-19. Plaintiff timely filed a Request for Review of the ALJ's decision.  R. 32-33.  The Appeals Council denied Plaintiff's request on October 10, 2006. R. 7-9.  However, Plaintiff never received a copy of that decision, and on February 9, 2007, the Appeals Council granted an extension of 60 days to file an appeal.  R. 6.  Plaintiff filed this action for judicial review on March 2, 2007.  Doc. No. 1.

### B.    Medical History and Findings Summary

Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary, Plaintiff complained of neck, back, and head injuries from a motor vehicle accident, and subsequent depressive symptoms.  R. 42, 80, 486, 488.  Plaintiff was forty-two years old at the time of the Commissioner's decision.  R. 10-19, 42, 464, 496.  Plaintiff has a high school education and previously worked as a truck driver; he last worked the day of the car accident.  R. 81, 86, 89-90, 480-84, 507.

After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from cervical degenerative disc disease, depression/adjustment disorder, and cognitive disorder, which constituted severe medically determinable impairments, but not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 14-15, Findings 3 & 4.  The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform light work, as he could lift twenty pounds occasionally and ten pounds frequently, but should avoid repetitive neck turning, as well as heights, stooping or bending;

required a sit/stand option; and was limited to simple, unskilled work that is low stress, and does not require a great deal of concentration, memory or interaction with coworkers.  R. 16-17, Finding 5.

In making this determination, the ALJ found that Plaintiff's "subjective complaints of pain and other limitations are not consistent with the objective medical evidence."  R. 16.  Based upon Plaintiff's RFC, the ALJ determined that he could not perform past relevant work.  R. 17, Finding 6. Considering Plaintiff's vocational profile and RFC, the ALJ used vocational expert (VE) testimony and Rule 202.21 of the Medical-Vocational Guidelines as a framework to conclude that there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  R. 17-18, Finding 10; R. 508-11.  Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision.  R. 18, Finding 11.

Plaintiff now asserts two points of error.  First, he argues that the ALJ erred by finding he had the RFC to perform sedentary work contrary to doctors' statements, and essentially ignoring Plaintiff's statements of his memory limitations.  Second, he argues that the ALJ erred in not allowing his mother to testify as a witness about the extent of his memory limitations at his hearing.  Because the Court finds that the ALJ's decision concerning Plaintiff's head injuries and memory problems was not based on substantial evidence, the Commissioner is **REVERSED** and **REMANDED**.

## II.  STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely

create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, he is not disabled. 29 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him

from doing other work that exists in the national economy, then he is disabled.   20 C.F.R. § 404.1520(f).

### A.      RFC and the treating physicians' opinions.

Plaintiff claims that the ALJ should not have found him able to perform any work in light of the memory and concentration limitations assigned by Drs. Derbenwich and Kawliche.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments.   20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997).   The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof.   *Id.*   Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.   *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d).   If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).   Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.   *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

Plaintiff was injured in a motor vehicle accident on August 8, 2002 when he stopped to make a turn in his personal truck and was hit from behind by a vehicle going about 55 miles per hour.   R. 144. He hit his head on the back windshield of the truck and was knocked out for perhaps a few seconds. R. 237. He had a headache, and noticed neck and back pain, tingling in this arms, loosening

of the left posterior inferior teeth, pain in his jaw, and trouble swallowing. R. 237. He was initially seen at Florida Hospital where x-rays were negative; he was given Flexeril and Anaprox. R. 143, 149. Because his daily headaches, neck and back pain, and jaw problems continued, he was seen by neurologist Frank S. Alvarez, Jr. on August 22, 2002 R. 237.  The prescribed hydrocodone and diazepan made him feel too "loopy" or "drugged."  R. 238.  Dr. Alvarez diagnosed concussion with post concussive symptomatology of dizziness, cervicothoracic strain, post traumatic headaches, lombosacral strain, and temporomandibular joint dysfunction; he ordered spine x-rays, physical therapy, message therapy, and referral to a dentist for the temporomadibular joint ("TMJ") diagnosis[1]. R. 239.

Plaintiff was limited to light duty not lifting over 15 pounds, with no excessive bending, twisting, turning, pushing, pulling or standing. At his August 29, 2002 appointment, Plaintiff complained of left shoulder pain, and he was diagnosed with left shoulder AC separation/sprain and referred to an orthopaedist.  R. 235.  On September 5, 2002, Plaintiff complained to Dr. Alavarez of his left arm pulling to his chest, the left side of his face shaking, twisting, and going into spasms, and Dr. Alvarez noted that those symptoms required an evaluation for seizures. R. 233.  When Plaintiff returned to Dr. Alvarez on September 26, 2002, he learned that the results of his EEG were abnormal due to intimate and pre transience noted more so in the left hemisphere, which appeared potentially epileptiform. R. 151, 231. The diagnosis was Plaintiff's post-traumatic headache symptoms were persisting. R. 232. Dr. Alvarez opined that the abnormal EEG was a normal variant because the

---

[1]Plaintiff saw an oral surgeon on September 17, 2002 for TMJ, and the oral surgeon suggested a night splint.  R. 157.

symptoms had subsided.  R. 232.  Dr. Alvarez referred Plaintiff to a surgeon for further cervical evaluation based on the results of MRI of the cervical and thoracic spine[2]. R. 232.

On October 28, 2002, Plaintiff returned to Dr. Alvarez for lower back pain with numbness in the bottom of his feet, neck pain and daily headaches, memory problems, concentration problems, and speech problems expressing himself –  he explained he was substituting words and sometimes his speech was nonsensical.  R. 228.  Dr. Alvarez opined the problems were post concussive symptoms with speech, articulation, concentration and memory. R. 228.  Dr. Alvarez indicated he could refer Plaintiff to a neuropsychologist to evaluate the memory problems, but Dr. Alvarez felt that those things would resolve on their own in time; he also suggested anti-depressants to help with concentration problems. R. 229.  After one month, Plaintiff's concussion symptoms had not resolved.

On December 1, 2002, when Plaintiff returned to Dr. Alvarez complaining of daily headaches, neck pain, low back pain, jaw pain, difficulty with memory and recall, and losing track in conversations, Dr. Alvarez suggested referral to a neuropsychologist and speech therapist for Plaintiff's post concussive-type symptomatology.  R. 226.  On February 6, 2003, Plaintiff underwent a speech-language pathology evaluation. R. 325.  The stated reason for the referral was to "improve memory, patient is now unable to complete ADL's [activities of daily living] successfully without modification (mother writes pt's checks, etc.)."  R. 325.  Plaintiff was given portions of the Ross Information Processing Assessment and diagnosed with "moderate to severe cognitive linguistic

---

[2]The MRI of the cervical spine revealed cervical levoscoliosis, reversal of the cervical lordosis, C2-3 osteophyte narrowing the left neural foramen, C3-4 disc bulge with spondylosis indenting the thecal sac with deformity of the anterior cord margin and narrowing the bilateral neural foramina, C4-5 loss of disc height and hydration with focal posterior central herniation nucleus pulposus indenting the anterior thecal sac, C5-6 loss of disc height and hydration with focal posterior central herniated nucleus pulposus indenting the anterior thecal sac, C6-7 loss of disc height indenting the thecal sac, C7-T1 osteophyte narrowing the right neural foramen. R. 232, 243-245. Thoracic MRI revealed a probable calcification in the central portion of the intervertebral discs. The diagnosis at that time was cervical strain symptoms persist with abnormal cervical MRI and thoracic strain symptoms persisting. R. 232. Following cervical spine fusion surgery, Plaintiff's condition was stable as of October 2003. R. 375, 358-361A.

deficits." R. 325.  His prognosis was good with modifications. He then attended weekly speech and memory therapy sessions from February 6, 2003 to May 8, 2003. R. 316-28.  On his last day of therapy on May 8, 2003, Plaintiff had achieved the maximum benefits for organizational skills, but "memory issues continue but [unreadable] given initial insult [sic], will be a factor in everyday life." R. 316.

On April 24, 2003, Plaintiff saw psychologist Dr. Bruce G. Borkosky for a consultative examination. R. 288.  Dr. Borkosky noted Plaintiff's complaints of memory problems, trouble saying the right word, and trouble staying on track. R. 288.  Dr. Borkosky noted Plaintiff "had subtle symptoms of a post concussive syndrome, such as a somewhat concrete understanding of questions, mis-understanding questions, losing track of the conversation, etc." R. 289.  On Mental Status exam, Plaintiff could follow simple commands, math skills were fair, abstract thinking was fair, concentration and persistence were good, and he could recall two out of three words after five minutes.  R. 289.  He assessed Plaintiff's intellectual level as borderline and opined Plaintiff's immediate and long term memory were normal (R. 289-90) despite Plaintiff's abysmal, "extremely low" scores on the Wechsler Memory Scale-III ("WMS").  R. 290.

On the section of the WMS test measuring working memory, which measures one's ability to hold information temporarily in memory for the purpose of using that information to perform a specific task, Plaintiff scored in the borderline range on that test, exceeding only 3% of the individuals in his age group.  R. 290.  On the section of the WMS measuring ability to learn and remember new material, Plaintiff scored in the "extremely low" range in immediate memory and in the general memory index, exceeding only 1% of the individuals in his age group. R. 290.  On auditory learning

he scored in the "extremely low" range after one presentation and borderline range for multiple trials[3]. R. 291.  Plaintiff also scored in the "extremely low" range in retention of information. R. 291. Despite "extremely low" range scores (worse than all but 1% of individuals in his age group) in seven of the eight categories tested by Dr. Borkosky on the Wechsler Memory Scale-III, and a "borderline" score (worse than all but 3% of individuals in his age group) in the eighth category (*see* R. 293 - summary), Dr. Borkosky opined that Plaintiff had a "good" ability to understand, remember and carry out instructions, and a "fair" ability to respond appropriately to supervision, coworkers and pressures. R. 292.  Dr. Borkosky diagnosed an adjustment disorder and a cognitive disorder not otherwise specified, and indicated a rule out diagnosis of Borderline Intellectual Functioning. R. 292.  He also opined that Plaintiff was capable of managing his own funds.  R. 292.

On its face, the consulting examiner Dr. Borkosky's opinion was inconsistent based on the obvious inconsistencies in Plaintiff's WSM **"extremely low"** memory test results and Dr. Borkosky's opinion that Plaintiff had a **"good"** ability to remember and carry out instructions.  The SSA recognized this and (to its credit) took the unusual step of re-contacting Dr. Borkosky to ask him to clarify the report of good memory and concentration, despite Plaintiff's extremely low memory test results.  R. 296.  In a three-sentence, handwritten response, Dr. Borkosky explained:

> During the [Mental Status] examination, he was able to perform the tasks - see circled items[4].  Perhaps the difference is that the WMS focuses on different tasks, *i.e.,* new learning of "unimportant" info. or perhaps he under performed on the WMS.  There were subtle signs of TBI [traumatic brain injury] as noted.  ADL's - consistent with subtle signs, as noted.

---

[3]Plaintiff's visual memory was consistent with his auditory memory, indicating modality-specific strengths and weaknesses were not apparent. R. 291.

[4]No "circled items" are attached to the report or in the original CE.  R. 296.

R. 296.  On January 4, 2004, Plaintiff was re-evaluated by Dr. Borkosky in an interview style examination, without the WSM-III being re-administered.  R. 392.  Dr. Borkosky opined that Plaintiff had "subtle symptoms of a post concussive syndrome, such as a somewhat concrete understanding of questions, mis-understanding questions, losing tack of the conversation, etc."  R. 392.  He again opined that, based on his examination, Plaintiff "had a good ability to understand, [and] a good ability to remember and carry out instructions . . . . and he is capable of managing his own funds."  R. 393.

The ALJ cites selective and irrelevant information from Plaintiff's April 23, 2003 psychological evaluation by Dr. Borkosky: "He did not display any psychotic symptoms such as delusions or hallucination."  R. 15.  Plaintiff did not allege any such impairments.  The ALJ further inaccurately cites, without any reference whatsoever to the obvious inconsistency the SSA had noted: "His memory functioning was adequate in the interview but low to borderline on the Wechsler memory scale.  It was felt that he was of low to borderline intelligence."  R. 15.  Plaintiff's performance was actually "extremely low" in seven categories and "borderline" in only one.  The ALJ's erroneous citation and misplaced reliance on Dr. Borkosky's CE was not based on substantial evidence.

Plaintiff also contends that the ALJ improperly discounted Plaintiff's claims of significant cognitive problems.  The ALJ concluded:  "[T]he claimant's alleged memory and concentration deficits are not supported by the record. The record is replete with detailed information provided by the claimant, which is inconsistent with a severe memory or concentration impairment. He testified at the hearing in great detail about his memory deficits, which is frankly inconsistent with someone who suffers from significant problems in this regard."  R. 16.

The Court has carefully reviewed the record of Plaintiff's written submissions and Plaintiff's testimony at the hearing.  The ALJ inferred that Plaintiff had himself completed the lengthy, cogent responses to the SSA forms.  Based on a careful review of the forms as completed by Plaintiff and his mother, it is clear that the vast majority of the forms were completed (although sometimes in the first person) by Plaintiff's mother, in an effort to provide as much information to the SSA as possible.  The very neat cursive handwriting in complete sentences/paragraph responses contrasts sharply with the erratic single word or phrase and short answers in shaky printing that Plaintiff himself completed.  *See, e.g.*, R. 115 (signed by Margaret Flanagan for Lloyd Flanagan); *compare* R. 79-96, 102-05 (by Plaintiff) *with* R. 106-10; 117-25 (DDS form completed and signed by Mother); R. 111-116; 126-32 (forms filled out by Mother, signed by Plaintiff).  Plaintiff's mother's efforts are consistent with his testimony and statements that she visits him every day or every other day, manages his funds, reminds him of appointments, and important tasks, and performs housework for him, along with another woman from his church, Mrs. Munch.  R. 489, 503-05.  Moreover, the transcript of the hearing shows that Plaintiff made frequent simple grammatical errors, tended to lose concentration in responding to question, and spoke in run on sentences, not answering direct questions. *See, e.g.*, R. 491-92, 495, 501-03, 507.  The ALJ's reliance on Plaintiff's mother's lucid and extensive responses to SSA forms or Plaintiff's responses during the hearing to discount Plaintiff's credibility was not based on substantial evidence.

Plaintiff also contends that the ALJ erred in failing to evaluate the opinion of Plaintiff's treating neurologist, Dr. Derbenwich.  Additionally, Plaintiff contends the ALJ did not properly evaluate the opinion of his psychiatrist, Dr. Kawliche. The Court finds that the ALJ mistakenly relied

on the opinion of Dr. Tweed and failed to evaluate, cite, or properly address the opinion of Dr. Derbenwich, and improperly rejected the opinion of Dr. Kawliche.

Plaintiff's treating physician, Dr. Alvarez referred Plaintiff to a neurosurgeon, Dr. C. Gilbert Tweed, who saw Plaintiff on December 18, 2002. Dr. Tweed eventually performed an anterior fusion on Plaintiff, whose condition was stable as of October 2003. R. 375, 358-361A. However, Plaintiff continued to complain of headaches, cognitive problems, and twitching in his left hand, arm and chest; in October of 2003, Dr. Tweed referred Plaintiff to a new neurologist, Dr. Mary Derbenwich, specifically for further treatment of the headaches. R 428-30.

Dr. Derbenwich opined the headaches were predominantly muscle contraction headaches, noting the cognitive problems along with irritability, insomnia, and difficulty functioning. R. 429. She felt that Topamax or Neurontin might help his cognitive problems, and ordered an MRI and EEG. R. 428. On December 12, 2003, Dr. Derbenwich noted that the Topamax was not helpful, and Plaintiff was switched to Neurontin. R. 425.

On November 13, 2003, Dr. Derbenwich referred Plaintiff to a psychiatrist, Dr. B. Kawliche. R. 421-22. Plaintiff complained of problems with short-term memory, concentration, focusing, headaches, depression and feeling unsteady, moody, and irritable; his mother had to take over paying his bills for him, because he could not organize that task. R. 421. Dr. Kawliche diagnosed mood disorder, secondary to general medical condition, *i.e.*, brain trauma; concussion, with severe memory cognitive difficulties contributing to his problems; he assigned Plaintiff a Global Assessment of Functioning (GAF) of 48[5]. R. 422.

---

[5]The GAF is a procedure for measuring overall severity of psychiatric disturbance. The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revised, Washington, D.C., 35 (2000), commonly referred to as the DSM-IV-TR. A GAF of 48 indicates serious symptoms, such as "unable to keep a job." Id., at 35.

Dr. Kawliche treated Plaintiff from November 13, 2003 until March 24, 2004. R. 416-421. Plaintiff started on Trileptal for the headaches, irritability and cognitive problems (R. 422), and increased the dosage on February 20, 2004. R. 418.  Dr. Kawliche opined on March 10, 2004 that Plaintiff was not able to return to work at that time due to his cognitive and psychological impairments. R. 417.  On March 24, 2004, Plaintiff noted no improvement on the Trileptal and thought it might have made his muscle twitches worse, so Dr. Kawliche started to wean Plaintiff off of the medication. R. 416.  Dr. Kawliche also noted that Plaintiff was going to lose his insurance in May and was working on finding some other arrangement for treatment; he continued to opine that Plaintiff was not able to work and he was "going at the very least [to] need prolonged recovery and it is also possible that he may not ever recover full function to be employed."  R. 416.

Although the ALJ acknowledged Dr. Kawliche's opinion in his decision, he gave it no significant weight (R. 17), because, the ALJ found, Plaintiff only saw Dr. Kawliche on three occasions and "stopped taking prescribed medications without clearance." R. 17.  Plaintiff points out that he did stop taking the medication, but only because he thought that it caused the elevation in his liver function tests.  Following assurances that this was not the cause, he did take the medication and even increased it according to the doctor's prescription. R. 418.  Dr. Kawliche eventually ordered Plaintiff to wean himself off of the medication because it was ineffective. R. 416.  Moreover, Plaintiff stopped seeing Dr. Kawliche, not because he did not need treatment, but because he lost his insurance. R. 416.  The ALJ's rejection of Dr. Kawliche's opinion for the erroneous reasons the ALJ cited was not based on substantial evidence.

The ALJ erroneously describes Dr. Tweed as Plaintiff's "neurologist," rather than as the "neurosurgeon" who performed the surgery on Plaintiff's spine in July 2003.  *See* R. 350 (admission

for anterior fusion by Dr. Gilbert Tweed, M.D.).   While the ALJ infers that Dr. Tweed's care of Plaintiff included Plaintiff's head injury symptoms, even Dr. Tweed (in follow up to the spine surgery) noted that he was not handling these symptoms and Plaintiff should be referred to a separate neurologist for diagnosis and treatment of Plaintiff's complaints of "organic symptomatology from the cerebral standpoint and probably needs to be evaluated by a neurologist to assess."  R. 363 (September 15, 2003).   On October 15, 2003, Dr. Tweed noted that Plaintiff was "doing well neurologically from the standpoint of the surgery" and "the *other complaints* are being addressed by Dr. Derbenwich."  R. 363.

Dr. Derbenwich first evaluated Plaintiff on October 3, 2003.  R. 438-30.  She then sent him for a series of tests including an EEG, and EMG and an MRI. R. 428.  She attempted to treat his headaches with medication.  R. 425.  On April 12, 2006, Dr. Derbenwich opined:

> This man was first seen by me in 2003 with the diagnosis of chronic daily headaches that have been present since a motor vehicle accident in 2002 or 2003. He has a muscle contraction component to his headaches. He has had a previous cervical fusion. He has cognitive dysfunction as well as memory problems. He has a lumbosacral radiculitis or a peripheral neuropathy. I feel that his problems are chronic and will never resolve. I feel that this man should be on permanent disability.

R. 461.  The ALJ's (and in turn the Commissioner's[6]) exclusive reliance on the opinion of the neurosurgeon Dr. Tweed, who treated Plaintiff exclusively for spine problems and radiculopathic symptoms, rather than his cerebral neurological problems, and failure to discuss the opinion of Dr. Derbenwich, the neurologist, was not based on substantial evidence.

---

[6]The Commissioner disingenuously contends, "Should the court determine that the ALJ's failure to specifically evaluate Dr. Derbewich's opinion constitutes reversible error," (Doc. No. 14 at 7) putting forth little argument to contradict Plaintiff's argument that remand was warranted on this ground.

**B.** **Witness**

Plaintiff asserts that the ALJ erred in not allowing Plaintiff to call his mother to testify about his memory limitations as a witness during his hearing. The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Although Plaintiff had counsel present, it is clear from Plaintiff's comments during the hearing that there had been an off the record discussion in which the ALJ precluded Plaintiff's mother from testifying about his condition. R. 498 ("My mom's outside. She can kind of, she wasn't allowed in here but I wish she was because she handles my [sic], she has the right to do everything for me."); 515 ("I know my mom can't come in here but she kind of explain [sic] to you what I have to do. She does it, you know what I'm saying.").

When, as in this case, the claimant tries to present testimony in support of his subjective complaints but is precluded from doing so by the ALJ, the claimant has done all that is necessary to establish prejudice. *See Depaepe v. Richardson*, 464 F.2d 92, 101 (5th Cir. 1972) (reversing ALJ's decision due to failure to weigh testimony of family members who corroborated claimant's testimony regarding subjective symptoms); *Gallun v. Bowen*, 638 F. Supp. 1272, 1275 (S.D. Fla. 1986) (ALJ is to considered subjective evidence of limitations as testified to by the claimant and corroborated by members of the family who have observed him). At the hearing on remand, the ALJ is directed to take testimony from Plaintiff's mother or other relevant witnesses, as appropriate and in accordance with the Social Security Regulations.

## CONCLUSION

For the reasons set forth above, the ALJ's decision is not supported by substantial evidence. Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ is **DIRECTED** to reassess Plaintiff's

maximum residual functional capacity after considering, and updating as appropriate, the medical reports from Dr. Derbenwich and any other treating physicians. An updated consultative examination to assess Plaintiff's memory problems may be requested by the ALJ, if warranted by the expanded record. Upon remand, the ALJ will schedule an additional hearing, allow Plaintiff to testify and present additional evidence, including the testimony of witnesses Plaintiff wants to present.

The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 18, 2008.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record